UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY KELLEY,

               Plaintiff,                          Hon. Sally J. Berens

v.                                             Case No. 1:23-cv-270

ONEKAMA CONSOLIDATED
SCHOOLS, et al.,

               Defendants.

_____/

## OPINION

Plaintiff Kelly Kelley, a former teacher with Onekama Consolidated Schools (OCS), has sued OCS, School Board of Onekama Consolidated Schools (the Board), Seth Pratt, Kimberly Blaszak, Gina Hagen, Lori Gildersleeve, Margaret Punches,[1] Gary Madden, and Tom Berard, alleging claims of: (1) gender and sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* (Count I), the Michigan Elliott–Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws. § 37.2101 *et seq.* (Count III), and the Fourteenth Amendment's Equal Protection Clause (Count V); (2) retaliation in violation of Title VII and ELCRA (Counts II and IV); and (3) violation of her right to due process under the Fourteenth Amendment's Due Process Clause (Count V).[2]

---

[1] Defendant Punches died sometime prior to January 9, 2025. (ECF No. 139 at PageID.1760.) Jeffrey Punches, as the Personal Representative of her estate, has been substituted in her place. (ECF No. 143.)

[2] Kelley has sued the individual Defendants in both their official and individual capacities. An official capacity suit is simply another way of asserting a claim against the entity of which the individual is an agent—here, OCS and the Board. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Because the official capacity claims are duplicative of the claims against the entity

Now before the Court are Defendant Pratt's Motion for Summary Judgment (ECF No. 119) and Defendants OCS, the Board, Blaszak, Hagen, Gildersleeve, Punches, Madden, and Berard's (OCS Defendants) Motion for Summary Judgment. (ECF No. 122.) The motions are fully briefed and ready for decision.[3] For the following reasons, the Court will **grant** the motion and **dismiss** Kelley's complaint **with prejudice**.[4]

## I.    Background

### A.    The Parties and Kelley's Employment with OCS

OCS is a small Michigan school district with an enrollment of approximately 300 students in kindergarten through 12th grade.[5] OCS hired Kelley near the beginning of the 2018–19 school year to teach high school and middle school math and science.[6] (ECF No. 122-7 at PageID.1342.) At times during her employment, Kelley also taught elementary grades but primarily taught math at the middle and high school levels. (ECF No. 122-7 at PageID.1343–44.) Kelley was hired as a probationary teacher and obtained a temporary teaching certificate on May 10, 2019, which was valid through June 30, 2024. (ECF No. 122-4 at PageID.1289.) Because she lacked permanent

---

Defendants, they may be dismissed as duplicative of the claims against OCS and the Board. *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) ("Where the entity is named as a defendant, an official-capacity claim is redundant."); *Doe v. Grandville Pub. Sch. Dist.*, No. 1:18-CV-309, 2018 WL 11507906, at *1 (W.D. Mich. Sept. 6, 2018) (dismissing official capacity claims as duplicative of claims against the entity).

[3] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the Court conduct all further proceedings in this case, including entry of judgment.

[4] Although Kelley and the OCS Defendants have requested oral argument, the Court finds that oral argument is unnecessary as the parties' briefs adequately develop the issues in contention.

[5] https://www.mischooldata.org/schools-in-district?locationCode=51060 (last visited Apr. 16, 2025).

[6] It appears that Defendant Hagen made the decision to hire Kelley, as Hagen was the only OCS employee who interviewed Kelley. (ECF No. 122-7 at PageID.1344.)

certification, Kelley participated in the "Teachers of Tomorrow" program, which provided an alternative route to obtain a permanent teaching certificate through classroom teaching observations and various courses or assignments that Kelley was required to complete prior to the expiration of her temporary certificate. (ECF No. 120-1 at PageID.1033; ECF No. 122-4 at PageID.1289.)

Defendant Hagen was the Principal when Kelley was hired and supervised Kelley during her first few years, including from approximately July 2020 until January 2022, while Hagen served as both the Principal and the Superintendent of OCS. (ECF No. 122-1 at PageID.1176; ECF No. 122-7 at PageID.1345–46.).) As Kelley's supervisor, Hagen addressed Kelley's lack of formal teacher training and education through in-person discussions on how she could improve her classroom skills, including classroom management and adherence to the authorized curriculum, rather than formal reprimands or improvement plans, although Hagen did complete Kelley's yearly written performance evaluations. (ECF No.120-3; ECF No. 122-1 at PageID.1185, 1193, 1208–09.)

OCS hired Defendant Pratt as an academic counselor in April 2021. Pratt assumed the additional role of Principal in January 2022. (ECF No. 134-4 at PageId.1666.) During the time period at issue, Pratt's sister's child attended OCS and had Kelley as his geometry teacher. (ECF No. 120-4 at PageID.1073; ECF No. 122-1 at PageID.1187.) When Pratt was first hired as an academic counselor, he told his sister that she should raise any concerns about individual teachers to Hagen rather than to him in order to avoid an appearance of impropriety or favoritism. (ECF No. 120-4 at PageID.1073.) Thus, when Pratt received emails from his sister about Kelley, he would forward them to Hagen. (ECF No. 122-1 at PageID.1187.) In March 2022, after a discussion

with OCS's attorney, Pratt adopted a policy precluding teachers from using the school's exercise room during school hours.[7]  (ECF No. 120-4 at pageID.1061–64.)

Defendant Blaszak became the Superintendent of OCS in February 2023, when Defendant Hagen accepted a job elsewhere. (ECF No. 122-6 at PageID.1312.) Defendant Gildersleeve was the Board President, and Defendants Punches, Madden, and Berard were Board members during the period of time relevant to this action (ECF No. 120-13), although Defendant Berard's first meeting as a Board member was not until January 2023. (ECF No. 122-5.)

### B.    The March 2022 Photograph Incident

On March 17, 2022, Kelley was exercising in the school's workout room when Pratt entered and took a picture with his phone. Kelley claims that Pratt photographed her exercising in workout attire (ECF No. 1 at PageID.3), while Pratt claims that he took a picture of a light fixture in the room that had not been properly fixed. (ECF No. 120-4 at PageID.1059; ECF No. 122-1 at PageID.1201.) Kelley perceived Pratt's act as sexual harassment and sent Hagen an email raising her concern. (*Id.* at PageID.1183.) Hagen spoke to Pratt about the issue and to OCS's attorney, who recommended an investigation into the complaint. (*Id.*) Ultimately, Hagen, Pratt, Kelley, and

---

[7] Pratt testified that his conversation with OCS's attorney occurred in March 2022. (ECF No. 120-4 at PageID.1062.) This testimony is consistent with Kelley's complaint allegation that Pratt sent an email out to the entire staff of OCS on March 23, 2022, stating that teachers were no longer permitted to use the exercise room during the school day. (ECF No. 1 at PageID.4.) In support of her responses to Defendants' motions, Kelley has submitted a declaration stating that there was no such restriction at the beginning of the 2022–23 school year, but after the start of that year, Pratt emailed teachers that they could no longer use the workout room during school hours. (ECF No. 132-9 at PageID.1559–60.) Kelley's complaint allegation, which has never been amended, constitutes a judicial admission that precludes Kelley's reliance on her statement in her declaration. *See Ferguson v. Neighborhood Hous. Servs.*, 780 F.2d 549, 551 (6th Cir. 1986) ("[U]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.") (internal citations and quotations omitted); *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.") (citing *White v. ARCO/ Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983)).

Joe Washington, the local union representative, agreed to a meeting on April 14, 2022, to discuss the issue and afford Kelley an opportunity to air her concerns. (*Id.*) Some of the details of the meeting are in dispute; Hagen and Pratt claim that Pratt offered to show Kelley the picture on his phone, but she declined the offer, while Kelley claims that Pratt never offered to show her the picture. (ECF No. 120-4 at PageID.1059–60; ECF No. 122-1 at PageID.1183–84; ECF No. 122-7 at PageID.1351.)

Regardless, the parties were satisfied with the meeting and believed that the issue had been resolved. (ECF No. 122-1 at PageID.1201; ECF No. 122-7 at PageID.1353.) Confirming this, the following day, Kelley sent an email to union members addressing an "OEA grievance" that had been withdrawn, as well as another grievance that "was resolved amicably last night when the (sic) Joe and I met with Mr. Pratt and Ms. Hagen." (ECF No. 120-6 at PageID.1085.) Even so, Hagen and Pratt agreed that it would be best for Hagen to supervise Kelley going forward in order to "take [Pratt] out of the equation" to the extent possible. (ECF No. 122-1 at PageID.1182; *see also* ECF No. 120-4 at PageID.1070–71.) Pursuant to this arrangement, Hagen conducted Kelley's year-end review in June 2022, during which Hagen suggested that Kelley focus on classroom discipline, grading, and following the curriculum as goals for the upcoming school year. (ECF No. 122-1 at PageID.1184–85.) Regarding the curriculum, Hagen reminded Kelley that she was required to use the math curriculum that the staff had chosen, although she was free to supplement it with extra materials so long as she followed the curriculum. (*Id.* at PageID.1193.)

Because Kelley was still uncomfortable dealing with Pratt when the 2022–23 school year began, Kelley and Hagen agreed that Hagen would continue to work with Kelley. (*Id.* at PageID.1188.) During this time, when Pratt received parent concerns or had his own concerns about Kelley's performance, he forwarded or raised them to Hagen. For example, around the

5

middle of October 2022, Pratt forwarded to Hagen two emails he had received from parents of students in Kelley's geometry class (including Pratt's sister) that in turn forwarded an email from Kelley to parents regarding a change in the grading/late work policy that the staff had adopted. Hagen found the email concerning because it was critical of, or expressed Kelly's disagreement with, the policy. (*Id.* at PageID.1186–87.) Independent of Pratt's communications, Hagen also received comments from parents about Kelley's teaching and failure to follow the curriculum. (*Id.* at PageID.1192–93.) In response, Hagen spoke with Kelley and reminded her that she was to use the approved curriculum and could not teach from a different curriculum. (*Id.* at PageID.1193.) On other matters, such as Pratt's reported observations of students walking into Kelley's class with food or backpacks in violation of school policy, rather than confronting Kelley directly, Hagen sent out staff-wide emails reminding them of the no food/backpack policy. (*Id.* at PageID.1207.)

On October 17, 2022, at Hagen's request, Kelley attended a meeting to address certain issues, including a report from two students that during a volleyball event, Kelley told them that Pratt had been fired from his previous job and was not qualified to be the Principal at OCS. When asked, Kelley denied making the statement. Hagen also brought up the parent email Kelley had sent out regarding the grading/late work policy. Hagen did not discipline Kelley for either issue but told her in the future to simply explain policies to parents without interjecting her personal views and asked her not to talk about personal matters with students. (*Id.* at PageID.1205–06.)

### C.    The Retaliation Complaint

On October 28, 2022, Kelley's husband submitted a formal complaint on Kelley's behalf to the Board complaining of retaliatory harassment she had experienced following her March 2022 complaint to Hagen concerning the picture. (ECF No. 120-7 at PageID.1236.) At Hagen's suggestion, Board President Gildersleeve contacted OCS's counsel, Ray Davis of Thrun Law.

(ECF No. 121-2 at PageID.1236–37.) Davis recommended, and the Board approved, hiring Dr. Mary Jo Banasik of the Thrun Firm, who specializes in such investigations, to investigate the complaint. (*Id.* at PageID.1238–39.) On November 29, 2022, after conducting her investigation, which included fact-finding interviews of Pratt, Hagen, and Kelley, Dr. Banasik issued a Memorandum to the Board setting forth her findings and conclusion that Mr. Kelley's complaints of sexual harassment or retaliation had not been substantiated. (ECF No. 122-3.)

### D.    The Second Investigation

While Dr. Banasik was investigating Mr. Kelley's complaint, she and the Board became aware of issues concerning Kelley's teaching performance and other matters, both through the fact-finding interviews and in comments received at the November 14, 2022 Board meeting. The Board approved Dr. Banasik's recommendation for a second investigation into the concerns pertaining to Kelley's teaching performance. (ECF No. 122-2 at PageID.1245; ECF No. 122-4 at PageID.1286.) In connection with this investigation and on the advice of counsel, the Board placed Kelley on paid, nondisciplinary administrative leave. (ECF No. 134-6.)

The investigation addressed the following issues:

- On September 23, 2022, Kelley permitted multiple students to leave her classroom and the campus to buy a pizza from the EZ Mart and return to campus and her classroom;
- Failure to make significant progress toward obtaining her "Teachers of Tomorrow" teaching certification;
- Failure to comply with the no-backpacks-in-class rule;
- Failure to follow the approved Canvas Curriculum and Planbook/PowerSchool;
- Targeting of students for participating in Snapchat messaging.

(ECF No. 122-4 1288–95.) In this investigation, Dr. Banasik interviewed math teacher Jason Lenon, Spanish teacher and parent Naomi Kolehmainen, Students A, B, and C, Pratt, Hagen, and Kelley. (*Id.* at PageID.1288.) On December 28, 2022, Dr. Banasik issued a Memorandum to the Board setting forth her findings and conclusions including, among other things, that Kelley had

allowed students to leave her classroom to purchase food at the EZ Mart, failed to make significant progress toward obtaining her Teachers of Tomorrow certification, failed to use the approved curriculum, and was insubordinate during her interview due to not answering Dr. Banasik's questions "honestly, forthrightly, and without evasion." (*Id.* at PageID.1302–05.)

Hagen reviewed Dr. Banasik's report and recommended to the Board that it terminate Kelley's employment after affording her a hearing in accordance with Board policy. (ECF No. 120-10.) Before the Board considered the matter, Hagen left OCS for another job and Defendant Blaszak became interim Superintendent. Although Blaszak was unfamiliar with the situation and was not involved in the investigation, the Board asked her to review the report and issue her recommendation. (ECF No. 122-6 at PageID.1331.) Like Hagen, Blaszak also recommended that the Board terminate Kelley's employment. (ECF No. 120-11.)

On February 20, 2023, the Board held a special meeting to consider Kelley's employment status and arranged for an attorney experienced in education law to serve as the hearing officer. Union representative Joe Washington presented evidence and argument on Kelley's behalf and Kelley was permitted to address the Board. The Board also heard from Hagen and Blaszak regarding their recommendations and the evidence they considered, and the Board received public comment until well after midnight from students, parents, and community members. (ECF No. 120-12.) Ultimately, a majority of the Board voted to terminate Kelley's employment. (ECF Nos. 120-13 and 120-14.)

## II.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.   Discussion

### A.    Discrimination Claims

Kelley alleges that Defendants discriminated against her in violation of Title VII, ELCRA, and the Fourteenth Amendment. Fourteenth Amendment and ELCRA disparate treatment claims are analyzed in the same manner as Title VII claims. *See James v. Hampton*, 592 F. App'x 449, 459–60 (6th Cir. 2015) (Title VII and equal protection claims); *Gielda v. Bangor Twp. Schs.*, 505 F. App'x 550, 555 (6th Cir. 2012) (Title VII and ELCRA claims). Thus, the Court will analyze these claims under the Title VII standard.

A plaintiff may establish a prima facie case of discrimination by introducing either credible, direct evidence of discriminatory intent or by circumstantial evidence through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because Kelley presents no direct evidence of discrimination, she must establish her claim through the *McDonnell Douglas* framework, which involves three steps:

> [T]he plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. If the plaintiff does so, the defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. Finally, if the defendant succeeds in this task, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.

*Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (cleaned up).

### 1.    Prima Facie Case

To establish a prima facie case of sex discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated male employees for the same or similar conduct. *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992)).

The first two elements of a prima facie case are not in dispute. Kelley is female, and her termination qualifies as an adverse employment action.[8] The OCS Defendants contend, however, that Kelley cannot establish the third and fourth elements.

### a.    Qualified for the Position

The Sixth Circuit has held that to meet the qualified element, "a plaintiff must show that her performance met her employer's legitimate expectations at the time of her discharge." *Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007) (citing *McClain v. Nw. Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 334 (6th Cir. 2006)). Defendants contend that Kelley was not qualified because, notwithstanding her earlier performance evaluations, the results from Dr. Banasik's

---

[8] The Court notes that, in her complaint, Kelley did not assert her termination of her employment as a basis for her Title VII or ELCRA discrimination claims against either the OCS Defendants or Pratt. Rather, she alleged that Defendants discriminated against her when Pratt took Kelley's picture and prohibited her from using the workout room while allowing male staff to use the workout room and not photographing them. (ECF No. 1 at PageID.8–10.) Kelley's responses do not argue discrimination on these bases. Rather, she limits her discrimination claim to her termination. Thus, any claim based on these allegations is deemed abandoned. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

December 2022 investigation "brought previously hidden issues to light, and also made plain the volume of violations." (ECF No. 122 at PageID.1160.)

This analysis, however, improperly conflates the prima facie case with Defendants' legitimate nondiscriminatory reason. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659–61 (6th Cir. 2000). As *Cline* explains, "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Id.* at 660–61. Kelley argues that she satisfies this element because she had not received any written or verbal reprimands or performance improvement plans prior to her termination, which shows that she was meeting OCS's legitimate expectations. (ECF No. 132 at PageID.1431.) Hagen, who actually supervised Kelley, testified that her approach with Kelley as a noncertified teacher was to provide verbal coaching rather than write ups for every issue. (ECF No. 122-1 at PageID.1208.) Hagen further testified that, while she determined that Kelley had issues warranting write-ups, legal counsel advised her against it due to the retaliatory optics arising from Kelley's complaint against Pratt. (*Id.* at PageID.1207–08.) Moreover, Hagen testified that she spoke with Kelley on more than one occasion about following the curriculum. (*Id.* at PageID.1193.) In her declaration, however, Kelley asserts that while Hagen helped her with certain topics, Hagen never told her that she was struggling with any area of her job before her termination. (ECF No. 132-9 at PageID.1559.) While the issue is close, the Court finds that Kelley has presented sufficient evidence to create an issue of fact as to whether she was qualified for the position.

### b.    Similarly-Situated Comparator

Kelley's claim fails on the fourth element because she has not identified a similarly-situated comparator who was treated differently than Kelley for the same or similar conduct. To be similarly-situated, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). "[R]ather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'" *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) (emphasis added)). As the Sixth Circuit has explained:

> [T]o be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell*, 964 F.2d at 583 (citation omitted).

Kelley contends that she has satisfied this element because Jason Lenon, a non-tenured male teacher who was struggling with classroom issues, was given an opportunity to improve through progressive discipline, while Kelley was not. (ECF No. 134-4 at PagveID.1675–76; ECF No. 134-5.) But Lenon was not similarly situated for several reasons. First, Kelley and Lenon did not deal with the same supervisor. As set forth above, Pratt supervised Lenon, and Hagen supervised Kelley. Incidentally, it is also notable that the performance improvement plan for Lenon that Kelley attaches to her response (ECF No. 134-5 at PageID.1694–95) was not authored by Pratt or Hagen; rather, Charles Schwarz—presumably Pratt's predecessor—authored it. Moreover, contrary to Kelley's representation, Pratt did not testify that he and Hagen did not use progressive discipline with Kelley because she had filed a complaint against him. (ECF No. 132 at

PageID.1422.) Rather, Pratt made clear that because of Kelley's complaint against him, Hagen alone—with her approach of providing verbal coaching rather than written reprimands—assumed responsibility for supervising Kelley. (ECF No. 134-4 at PageID.1677.) Second, Lenon and Kelley did not engage in the same or similar conduct. While Kelley did have some classroom management issues, Dr. Banasik's report identified many more issues. Perhaps most concerning, as Hagen and Blaszak set forth in their letters to Kelley, Kelley was insubordinate during the investigation by failing to answer Dr. Banasik's questions "honestly, forthrightly, and without evasion." (ECF No. 120-10 at PageId.1123; ECF No. 120-11.) Finally, the circumstances giving rise to Kelley's termination were wholly different from those concerning Lenon's progressive discipline. Pratt dealt with Lenon in the ordinary course of supervising him in response to parent and administrative concerns about Lenon's classroom management, while the Board authorized Dr. Banasik's second investigation on her recommendation based on issues that she uncovered during her initial investigation of Mr. Kelley's complaint that went beyond classroom management, including Kelley's failure to make significant progress in completing her "Teachers of Tomorrow" requirements and her failure to follow the curriculum.

Accordingly, Kelley fails to raise an inference of discrimination. Kelley's assertion that the temporal proximity between Mr. Kelley's October 28, 2022 email and the commencement of the second investigation is circumstantial evidence of discrimination (ECF No. 132 at PageID.1422) is meritless, as it not only erroneously relies on retaliation principles for a discrimination claim, but it is refuted by undisputed evidence that Dr. Banasik—not Pratt, Hagen, or any other Defendant—proposed the separate investigation of Kelley.

## 2.    Nondiscriminatory Reason

Even if Kelley could establish a prima facie case, Defendants have articulated a legitimate, nondiscriminatory reason for Kelley's termination, namely, the findings and conclusions from Dr. Banasik's investigation of issues concerning Kelley's classroom conduct and instructional responsibilities. To refute the employer's proffered reason for the adverse employment action, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). A plaintiff may demonstrate pretext by introducing evidence that the employer's proffered reason: (1) had no basis in fact; (2) did not actually motivate the employer's action; or (3) was insufficient to motivate the employer's action. *Id.* at 1084. Moreover, a plaintiff must show, not only that the proffered reason was pretext, but also that discrimination was the real reason for the employment decision. *Harris v. Metro. Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 486 (6th Cir. 2010).

Kelley falls short of demonstrating pretext. She argues that Defendants' reason is "internally inconsistent," apparently because Defendants claim that Kelley's performance issues existed before Dr. Banasik documented them in her report, "but it took an outsider, Ms. Banasik, to bring these alleged issues to their attention." (ECRF No. 132 at PageID.1422.) But there is no inconsistency. While Hagen was aware of some of the issues raised in Dr. Banasik's report, there is no indication that she was aware of all of them, and as noted, in recommending termination, Hagen relied heavily on Kelley's failure to answer Dr. Banasik's questions "honestly, forthrightly, and without evasion." (ECF No. 120-10.)

Even if Hagen (or Blaszak) or the Board made an incorrect decision or a mistake, the honest belief rule applies: "Where the employer can demonstrate an honest belief in its proffered reason . . . the inference of pretext is not warranted." *Joostberns v. United Parcel Servs., Inc.*, 166 F.

14

App'x 783, 791 (6th Cir. 2006). "Under the honest belief rule, an employer's proffered reason is considered honestly held where the employer can establish it reasonably relied on particularized facts that were before it at the time the decision was made." *Id.* (quotation marks and brackets omitted). Because Defendants have shown that they reasonably relied on Dr. Banasik's report, there is no basis to infer pretext. Kelley's belief that the process was unfair, her disagreement with the Board's hiring of Dr. Banasik—an employee of Thrune Law—to investigate both her husband's retaliation/harassment complaint and to investigate Kelley's performance issues, and her disagreement with Dr. Banasik's findings provide no basis to demonstrate pretext. "The salient issue in a Title VII claim of discrimination is whether the plaintiff was singled out because of her membership in a protected class and treated less favorably than those outside of that clas, not whether she was treated less favorably than 'someone's general standard of equitable treatment.'" *Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010) (quoting *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 1988)). In sum, Kelley fails to present evidence that her termination was motivated by discriminatory animus based on her sex or gender.

### 3.     Defendant Pratt

Defendant Pratt separately argues that he cannot be held liable for discrimination because he had no authority to terminate Kelley's employment and played no part in the Board's decision. Kelley responds by citing Title VII cases finding employer liability, even though the decisionmaker did not act with discriminatory animus, because the plaintiff presented evidence establishing a "'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 677 (6th Cir. 2008) (citing *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir. 1992)). However, *Madden*, and *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339 (6th Cir.

2012), which Kelley also cites for application of the so-called "cat's paw" theory of liability, are inapplicable here for several reasons. First, those cases imposed liability on the employer, not the supervisor. Second, Hagen, not Pratt, was Kelley's supervisor. Third, even if those cases could be construed to apply to claims against non-supervisors, Kelley's claim that "Pratt's continual false statements about her violating school policies, including his false statements to Ms. Banasik, directly led to the Defendant School Board's decision to fire her," (ECF No. 134 at PageID.1591–92), is unsupported by admissible evidence. That is Kelley offers only her unsupported assertions that: (1) Pratt actually made a false statement;[9] (2) that was motivated by discriminatory animus; and (3) that Pratt's statement was a proximate cause of the Board's decision to terminate her. In fact, the evidence shows that, if anything, the Board relied on Hagen's and Blaszak's recommendations for termination as support for its decision. (ECF No. 120-13.)

### B.    Retaliation under Title VII and ELCRA

Kelley alleges that Defendants retaliated against her in violation of both Title VII and ELCRA for her complaint against Pratt about taking the picture of her and her husband's October 2022 complaint about harassment and retaliation by Pratt and Hagen in response to Kelley's earlier complaint. In particular, Kelley alleges that Pratt: (1) singled her out in staff meetings; (2) bolted into her classroom and accused her of misconduct; (3) told her that unnamed parents had complained about her; (4) prohibited her from using the workout room; (5) made false statements to Hagen about Kelley's violations of school policy; (6) told some of Kelley's students that he was going to get her fired; (7) had his sister and other parents complain about Kelley at the November 14, 2022 Board meeting; and (8) failed in to engage in progressive discipline with Kelley pursuant

---

[9] Regarding the issues of backpacks and food in her room, Kelley admitted that students would bring backpacks into her room and would have food (snacks) in her room. (ECF No. 122-7 at PageID.1347.)

to the collective bargaining agreement. Kelley further alleges that the OCS Defendants placed her on administrative leave, had a biased investigator perform the investigation against Kelley, and terminated her employment. (ECF No. 132 at PageID.1425–27; ECF No. 134 at PageID.1594–96.)

Retaliation claims under Title VII and ELCRA are analyzed under the same standards. *Jackson v. Genessee Cnty. Road Comm'n*, 999 F.3d 333, 343 (6th Cir. 2021). Circumstantial retaliation claims, such as Kelley's, are evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer was aware of her protected activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the action. *Id.* If the defendant meets its burden, the plaintiff must then demonstrate that the proffered reason was pretextual. *Id.* This entails a showing that the defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the adverse action, or (3) was insufficient to motivate the adverse action. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. *Id.* "Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times." *Id.*

There is no dispute that Kelley's April 7, 2022 complaint to Hagen and her husband's October 2022 complaint to the Board constituted protected conduct. Kelley's retaliation claims fail on the causal connection prong.

### 1.    Adverse Action

The scope of adverse action in retaliation cases is broader than what may be considered adverse in actions affecting "the terms, conditions, or status of employment" pursuant to Title VII's substantive antidiscrimination provision. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61 (2006); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 346 (6th Cir. 2008) (adverse actions in retaliation cases are not "limited to [the] narrow definition of an 'adverse employment action' that includes only actions affecting the terms, conditions or status of employment"). An action is adverse under the antiretaliation provision if it could "well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. However, such action still must be materially adverse, meaning that an individual is protected from "retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.

As an initial matter, many of the actions Kelley alleges are simply "petty slights or minor annoyances" that caused Kelley no injury or harm. *Id.* at 68. This includes Pratt singling Kelly out at staff meetings (Kelley admitted that Pratt did not refer to her by name but only that she "felt very singled out" (ECF No. 122 at PageID.1353–54)); accusing her of misconduct and making false statements to Hagen about her violations of school policies; and telling her that unnamed parents had complained about her. As for other alleged actions, Kelley has failed to present any admissible evidence to support them. She presents no admissible evidence—from parents, including Pratt's sister—that Pratt encouraged them to complain against her at any time, including the November 14, 2022 Board meeting. As for the workout room allegation, Kelley admitted that

she could use the workout room in the evening, which was consistent with Pratt's policy of no use during the day. (ECF No. 122-7 at PageID.1357.) To the extent Kelley asserts that Pratt allowed male staff to use the workout room after he adopted the policy, Kelley's own testimony is based on inadmissible hearsay. *See North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997) ("[T]he testimony of Chaffee is inadmissible hearsay and therefore cannot defeat a motion for summary judgment."). The same is true as to her allegation that Pratt told some of her students that he was going to get her fired. As to the allegation that Pratt failed to afford her progressive discipline, as explained above, Pratt was not Kelley's supervisor and thus was not involved in overseeing her performance. Finally, Kelley presents no evidence (other than her own subjective belief) that Dr. Banasik was biased against her or that any Board member was aware of any alleged bias.

As for placing Kelley on administrative leave and terminating her employment, while those actions may be considered adverse actions, Pratt was not involved in those actions. Rather, it was solely the Board.

## 2.    Causal Connection

Regarding placement on administrative leave and termination, Kelley argues that she was placed on administrative leave and the second investigation commenced within 18 days of her husband submitting his complaint to the Board. She argues that this "close temporal proximity" provides the requisite causal connection with her and her husband's complaints. When an adverse employment action occurs soon the employer learns of protected activity, that temporal connection can "constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). On the other hand, the Sixth Circuit has "repeatedly cautioned against inferring causation based on temporal

proximity alone." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471 (6th Cir. 2012) (citing *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) ("[T]emporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim.")). Because Kelley's complaint against Pratt occurred more than six months before the alleged adverse actions, it cannot support an inference of retaliation without other evidence. *See Blosser v AK Steel Corp.*, 520 F. App'x 359, 363–64 (6th Cir. 2013) (concluding that the four-month period at issue fell into the category of cases requiring a plaintiff to "couple temporal proximity with other evidence to show causation"); *Meadows v. Wahler Auto. Sys., Inc.*, 45 F. Supp. 3d 645, 661 (E.D. Mich. 2014) ("The Sixth Circuit has held that multi-month gaps between protected activities and discharge— like the over four-month gap that exists here—create no more than a 'loose temporal proximity' that is insufficient to create a triable issue [on causation].'" (quoting *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999))).

Assuming that the temporal proximity between Mr. Kelley's complaint and the adverse actions suffices to create an inference of retaliation, an intervening event that provides a legitimate reason for adverse employment action "dispels an inference of retaliation based on temporal proximity." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013); *see also Wasek*, 682 F.3d at 472 (holding that the plaintiff's act of leaving the worksite without authorization after having complained about sexual harassment constituted an intervening event that gave his employer a legitimate reason to take adverse action). Here, Dr. Banasik's recommendation for a second investigation, which led to Kelley's placement on administrative leave and eventual termination, constituted an intervening event that negates any inference of retaliation. Therefore, Kelley fails to establish a prima facie case of retaliation.

### 3.     Legitimate Reason

Even if Kelley had established a prima facie case of retaliation, for the reasons previously set forth, she fails to show that Defendants' reasons for placing her on paid administrative leave and ultimately terminating her employment were pretext. That is, the Board accepted Dr. Banasik's recommendation for an additional investigation, and both Hagen and Blaszak relied on Dr. Banasik's investigation report—most notably, her conclusion that Kelley had been less than candid in answering Dr. Banasik's questions—in recommending that the Board terminate her employment after affording her a hearing. The Board, in turn, reasonably relied on these recommendations. Accordingly, Kelley's retaliation claim fails on this ground as well.

### C.     Due Process Claims

Having disposed of Kelley's equal protection claim above, the Court considers her remaining Section 1983 claims. Kelley purports to allege both procedural due process and substantive due process violations. As to Pratt, Kelley alleges that he violated her right to substantive due process by taking a picture of her without her permission and prohibiting her from using the workout room and exercise equipment while allowing male staff to use the workout room and equipment and acting in concert with the Board to terminate her employment in retaliation for her complaint about discrimination and harassment. (ECF No. 1 at PageID.11.) As to the OCS Defendants, Kelley alleges that they: (1) violated her right to substantive due process by failing to use an objective third-party investigator; ratifying Dr. Banasik's investigation, despite her clear bias and intentional disregard for witnesses; withholding information from her relating to the allegations; and convening a secret school board meeting which hindered her ability to defend herself; and (2) violated her right to procedural due process by refusing to inform her of the

allegations against her prior to her interview and withholding the names of the individuals who complained against her. (*Id.* at PageID.12.)

### 1.    OCS Defendants

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. "The due process clause has both procedural and substantive components." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (citing *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012)). The Supreme Court has described the right to due process as follows:

> The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards."

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 541 (1985) (quoting *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)).

Procedural due process requires that the government provide an individual "the opportunity to be heard in a meaningful manner" before depriving him or her of a property or liberty interest. *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996) (internal quotation marks omitted). In contrast, the doctrine of substantive due process provides that "governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Range*, 763 F.3d at 588 (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). "In order to assert a valid procedural due process claim, a plaintiff first must show that it has been deprived of a protected property interest." *McCormick & Assocs., Inc. v. City of*

*Detroit*, 61 F. App'x 953, 955 (6th Cir. 2003). "Absent a protected property interest, a plaintiff cannot assert a due process violation." *Id.*

The substantive due process doctrine is more limited. "It protects a narrow class of interests enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that shock the conscience." *Prado v. Thomas*, 804 F. App'x 332, 343 (6th Cir. 2020) (internal quotations omitted) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249-50 (6th Cir. 2003)). In the area of public employment, the Sixth Circuit has held that state-created contract rights, such as those arising from tenured employment, cannot support a substantive due process claim. *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1350 (6th Cir. 1992). Therefore, unless a plaintiff alleges the violation of a fundamental right, "the termination of public employment does not constitute a denial of substantive due process." *Id.* at 1351. Kelley has not alleged or demonstrated that one of her fundamental rights was infringed in connection with the termination of her employment, nor has she alleged that she was subjected to conscience-shocking conduct. Thus, Kelley's substantive due process claim fails.

Even if Kelley could allege a viable substantive due process claim based on a property interest, she must still show, for both her procedural and substantive due process claims, the existence of a protected property interest. Property interests are not created by the Constitution, but instead "'stem from an independent source such as state law.'" *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). As Defendants note, Kelley was a probationary, non-tenured teacher. Thus, they contend, she had no protected interest in continued employment. (ECF No. 122 at PageID.1167.) Kelley concedes that she was a probationary employee but responds that she had a right to progressive

discipline and continued employment because she was "a full member of the Union protected by the collective bargaining agreement." (ECF No. 132 at PageID.1433.) As support, Kelley cites not the collective bargaining agreement (CBA), but her own declaration stating that she was a member of the OEA, served as its Vice President for two years, and "was entitled to all of the rights and protections afforded to teachers under the [CBA]." (ECF No. 132-9 at PageID.1558.) Kelley's self-serving statement is insufficient to support her claim. Although not in the record, the 2021–22 CBA, which is publicly available online, makes clear that Kelley was not entitled to the CBA's protections and benefits as it applied only to teachers "presently holding a valid certificate issued by the State Board of Education," and excluded "all non-certified personnel." [10] *See* https://drive.google.com/file/d/1v823aaGLCQqw3ldbW70JeqT8QQzCegOC/view, Art. I §§ B and C. While Kelley may have joined the OEA and served as an officer, she was not covered by the CBA with OCS. Therefore, Kelley lacks a protected property interest to support a due process claim.

Finally, even if Kelley could demonstrate the existence of a protected property interest, it is undisputed that she was provided a copy of Dr. Banasik's report, given notice of a hearing and advised of her rights to provide documentation and witnesses and to speak at the hearing, and actually afforded the same type of due process hearing that OCS provided tenured, certified teachers. Kelley's assertions that Dr. Banasik was biased and that the due process hearing was a "sham" are unsupported by evidence and based on nothing more than Kelley's own conjecture and speculation, which do not suffice to defeat a summary judgment motion. *See Harrow Prods., Inc.*

---

[10] While the 2021–22 CBA expired in August 2022, the Court has no reason to believe that the CBA covering the 2022–23 school year would have been extended to cover non-certified teachers.

*v. Liberty Mut. Ins. Co*., 64 F.3d 1015, 1020 (6th Cir. 1995) (observing that speculation and conjecture will not suffice to withstand a motion for summary judgment).

Accordingly, Kelley's due process claims fail as to the OCS Defendants.

### 2.    Defendant Pratt

For the reasons set forth above as to the OCS Defendants, Kelley's due process claim regarding her termination also fails against Pratt. Moreover, as previously discussed, Pratt was not Kelley's supervisor, had nothing to do with Dr. Banasik's investigation (other than being interviewed), and was not involved in the decision to terminate her employment.

As for Kelley's substantive due process claim based on being photographed in the workout room, Kelley fails to cite any authority supporting her claim of a right to privacy in the workout room that amounts to a fundamental interest. Regardless of its location and its characteristics, *i.e.*, glass or concrete walls, the workout room was open for use by teachers and other school staff and not intended for private use, like a bathroom or shower facility, where private or intimate activities are performed. Thus, assuming that Pratt took Kelley's picture in the workout room, he did not violate any right to privacy she might have had that would support a substantive due process claim. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 575 (6th Cir. 2002) ("The Supreme Court has found that 'fundamental' interests include the privacy interest one has in matters relating to marriage, procreation, contraception, family relationships, child rearing, and education." (citing *Paul v. Davis*, 424 U.S. 693, 713 (1976))).[11]

---

[11] Given the conclusion that Kelley fails to show that Pratt violated her due process rights, the Court finds no need to address Pratt's qualified immunity argument. In any event, Kelley has failed to cite any case clearly establishing that she had a privacy interest while exercising in the workout room.

**D.      Motion to Show Cause**

Pending before the Court is Kelley's unresolved motion to show cause (ECF No. 92), in which Kelley requests an order finding that her allegation that Pratt photographed her in the workout room on March 17, 2022 has been established. Kelley does not assert a hostile work environment sexual harassment claim in her summary judgment responses, and whether Pratt in fact photographed Kelley is immaterial to her discrimination, retaliation, and due process claims. Accordingly, considering the Court's determination that summary judgment is proper as to all claims, the motion will be denied as moot.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Defendants' motions for summary judgment and dismiss Kelley's complaint with prejudice.

A separate order will enter.

Dated: May 15, 2025                                      /s/ Sally J. Berens
                                                        SALLY J. BERENS
                                                        U.S. Magistrate Judge